**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **JUAN GUILBE,** | : | |
| Plaintiff, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
| - against - | : | **13-CV-6725 (JPO) (RLE)** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| Defendant. | : | |

**TO THE HONORABLE J. PAUL OETKEN, U.S.D.J.:**

## I. INTRODUCTION

*Pro se* Plaintiff Juan Carlos Guilbe ("Guilbe") commenced this action under the Social Security Act ("Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), challenging a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability benefits. Guilbe asks the Court to modify the decision of the Commissioner and grant him disability insurance benefits ("DIB") and/or supplemental security income ("SSI") benefits, retroactive to the date of the initial disability, or, in the alternative, to remand the case for reconsideration of the evidence. Guilbe argues that the decision of the Administrative Law Judge ("ALJ") was erroneous and not supported by substantial evidence. On September 4, 2014, the Commissioner moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to affirm the Commissioner's decision and dismiss the Complaint. For the reasons that follow, I recommend that the Court **GRANT** the Commissioner's Motion and **DISMISS** the case.

## II. BACKGROUND

### A.  Procedural History

Guilbe applied for SSI and DIB on August 30, 2011, claiming to have been disabled by depression since September 5, 2010. (Admin. Record ("Record" or "R.") at 84, 94.)  The application was initially denied on October 26, 2011, and Guilbe requested a hearing on December 9, 2011.  (*Id.* at 62-70.)  ALJ Jerome Hornblass ("ALJ" or "ALJ Hornblass") held a hearing on May 9, 2012, with Guilbe appearing *pro se*.  (*Id.* at 44.)  On June 12, 2012, the ALJ found that Guilbe was not disabled within the meaning of the Act because Guilbe's substance abuse was a material factor contributing to his disability.  (*Id.* at 9-22.)

Guilbe appealed the decision to the Appeals Council on August 13, 2012, and the Appeals Council denied his request for review on September 4, 2013, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 1-6.)  Guilbe filed this action on September 20, 2013.  The Commissioner answered on March 21, 2014, and filed the present motion on September 4, 2014.

### B.  ALJ Hearing and Decision

#### 1.  Guilbe's Testimony at the Hearing

Guilbe was the only witness at the May 9, 2012 hearing.  (R. at 44-59.)  He was born on October 16, 1968, making him forty-three years old at the time of the hearing.  (*Id.* at 44-45.)  He had been living in a homeless shelter in Brooklyn, New York, for approximately a year and a half because he had lost Section 8 housing two years earlier.  (*Id.* at 45, 47-48.)

Guilbe last worked about two years before the hearing as a fast food cook during the U.S. Open.  (*Id.* at 46.)  This job ended after about two weeks, and Guilbe has not worked since.  (*Id.*)  Before his job at the U.S. Open, Guilbe worked as a security guard for a Coach warehouse.  (*Id.*)

2

This job lasted approximately seven years, until Guilbe was laid off after September 11, 2001.[1] (*Id.* at 47.)

Guilbe testified that he could no longer work as a security guard because of back problems and depression. (*Id.* at 47-48.) He attributed the depression to the loss of his apartment, after which, he began having trouble sleeping and began taking medicine for depression. (*Id.* at 48.) He testified that he did not feel "ready to work" because of his depression and drug problem, and described "worrying more and about . . . other people" including his mother, and his three children in Puerto Rico. (*Id.* at 54-55.) He did not testify further about the symptoms of his depression, as his response to the ALJ's final question regarding the depression was unclear, possibly because of his limited English language skills.[2] (*Id.* at 56.) Guilbe added, however, that the psychiatrist he was seeing as part of his drug treatment program, believed that he was able to work. (*Id.* at 54.)

Guilbe testified that he has been addicted to heroin for twenty-five years, and has been in a methadone[3] treatment program at Metropolitan Hospital for almost two years. (*Id.* at 49-50.) During that time, he had relapsed seven times. (*Id.* at 57.) At the time of the hearing, he had been clean for two months (before that, after a positive urinalysis, the methadone treatment

---

[1] The Record is inconsistent regarding Guilbe's work history. His Disability Report records his employment history more comprehensively than Guilbe's oral testimony. According to that report, in 1998, for less than a year, Guilbe worked at a factory in packing and receiving. *See* R. at 95. From 1999 to 2000, he was a cleaner for a cleaning company. *Id.* In 2001, Guilbe worked as a fast food cook. *Id.* From 2002 to 2003, Guilbe was a security guard. *Id.* From 2004 to 2010, Guilbe again worked as fast food cook. *Id.*

[2] Guilbe testified that, although he understands English well, he cannot speak English "very well." *Id.* at 44.

[3] Methadone "is used to prevent withdrawal symptoms in patients who were addicted to opiate drugs and are enrolled in treatment programs in order to stop taking or continue not taking the drugs." *Methadone Definition*, NATIONAL INSTITUTE OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html (last accessed Jan. 30, 2015).

program raised his dosage from 40 to 70 milligrams). (*Id.* at 57-58.) He testified that he does not use cocaine, marijuana, or drink alcohol excessively. (*Id.* at 52-53, 56-57.)

Guilbe takes public transportation to the methadone treatment center seven days a week, at 8:00 a.m. (*Id.* at 49-50.) After leaving the treatment center, Guilbe visits his mother, with whom he is close. (*Id.* at 51.) He spends the day with his mother, cooking meals, going grocery shopping, taking his mother to appointments, caring for her dogs, and cleaning her house. (*Id.* at 51-52.) He also attends group sessions at the treatment center. (*Id.* at 52.)

### 2.  Medical Evidence

#### a.  Metropolitan Hospital Center (March – June 2011)

Dr. Faith Aimua, a psychiatrist, saw Guilbe on March 1, 2011, at the Metropolitan Hospital Center Behavioral Health Walk-In Clinic. (R. at 109.) Dr. Aimua recorded Guilbe's primary complaint as insomnia, but he also indicated that he had a torn ligament in his knee. (*Id.*) Guilbe reported that he was "stressed out" and "sad" because of the loss of his apartment six months earlier. (*Id.*) He did not report any change in appetite, feelings of hopelessness, suicidal or homicidal ideation, or any psychotic symptoms. (*Id.*) He did not report any prior psychiatric history or suicide attempts, and also denied any feelings of anxiousness or anger problems. (*Id.*) Guilbe reported that he was working "odd jobs" since losing his job two years earlier. (*Id.*) Although Guilbe reported that he had not used heroin for about a year, he also said that he had recently relapsed to using about a bag of heroin every other day. (*Id.*) Dr. Aimua noted that Guilbe's mental status examination was unremarkable and he did not "need psychiatry treatment at this time." (*Id.* at 109-10.) She did not prescribe any medications. (*Id.*) A

4

urinalysis performed that day was positive for THC (tetrahydrocannabinol),[4] cocaine, methadone, and opiates. (*Id.* at 120, 122.)

On March 1, Dr. Harold Goodman, a psychiatrist, also saw Guilbe. (*Id.* at 112.) Dr. Goodman recorded largely the same results as Dr. Aimua. Guilbe's assessment was normal, with the exception of his insomnia. (*Id.*) His mood was consistent with his circumstances and there was no evidence of personality disorder or psychosis. (*Id.*) Dr. Goodman recorded Guilbe showed no "barriers to learning" and stated that he was ready to learn, actively sought information, and had some college education. (*Id.* at 113.)

Dr. Goodman saw Guilbe again at Metropolitan Hospital Center ("MHC") on April 25. (*Id.* at 114.) The evaluation results were similar. Guilbe was "self-referred" and his primary complaint was "depressed feelings." (*Id.*) He was not taking any medications. (*Id.*) Dr. Goodman recorded Guilbe's history of heroin abuse and his use of heroin the day before his visit to the clinic. (*Id.* at 116.) A urinalysis performed that day was positive for THC, cocaine, methadone, and opiates. (*Id.* at 123, 125.)

On June 3, Marta Herrera, a registered nurse, saw Guilbe. Herrera diagnosed Guilbe with drug-induced mood disorder and dependent personality disorder. (*Id.* at 118.) She also noted that Guilbe was substance dependent. (*Id.*) She prescribed antidepressant medication. (*Id.*)

### b. Evaluation by Consulting Psychologist (October 2011)

Guilbe met with Dr. Michael Alexander, a psychologist, on October 7, 2011. (R. at 130.) He reported that he had been unemployed since the summer of 2010. (*Id.*) Dr. Alexander noted that Guilbe "had not really looked [for work] since then" and it was "apparent" that he had not

---

[4] THC is "the chief intoxicant in marijuana." *THC Definition*, MERRIAM-WEBSTER MEDICAL DICTIONARY, http://www.merriam-webster.com/medlineplus/thc (last accessed Jan. 30, 2015).

done so because of his drug and alcohol use. (*Id.*) Guilbe was not taking medication at the time because although he had a prescription for Celexa,[5] he had stopped because he had insufficient medical insurance. (*Id.*) Guilbe reported difficulty sleeping and a five-year history of "dysphoric mood"[6] but no further symptoms of depression, including suicidal or homicidal thoughts. (*Id.*)

The results of Guilbe's mental status examination were unremarkable. (*Id.* at 131.) He was cooperative, friendly, alert, and polite, with adequate social skills and manner of relating to others. (*Id.*) He appeared well-groomed, with appropriate and casual mode of dress and normal gait, posture, and motor behavior. (*Id.*) Guilbe also showed appropriate eye contact. (*Id.*) Dr. Alexander reported that Guilbe used adequate conversational language, and his thought processes were coherent and goal-directed. (*Id.*) His affect was full, his mood was neutral, and his attention, concentration, and memory were intact. (*Id.*) Dr. Alexander recorded Guilbe's cognitive function as average, and his insight and judgment as adequate. (*Id.*)

Dr. Alexander noted that Guilbe was able to dress, bathe, and groom himself, and Guilbe stated that he was able to cook, clean, shop, and manage his own money "if circumstances permitted."[7] (*Id.* at 132.) Guilbe used public transportation independently, and arrived at the examination by public transportation with his mother. (*Id.* at 130, 132.) He reported having friends, and having close relationships with his mother, brother, sisters, and three children. (*Id.* at 132.) Guilbe reported spending his time at home, watching television and listening to the

---

[5] Celexa is a brand name for the drug citalopram, used to treat depression. *Citalopram Definition*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last accessed Jan. 30, 2015).

[6] Dysphoria is defined as "a state of feeling unwell or unhappy." *Dysphoria Definition*, MERRIAM-WEBSTER MEDICAL DICTIONARY, http://www.merriam-webster.com/medlineplus/dysphoria (last accessed Feb. 9, 2015).

[7] The report does not elaborate on what Guilbe meant by this phrase.

6

radio. (*Id.*) Dr. Alexander noted that Guilbe could follow and understand simple directions, perform simple and more complex tasks independently, maintain a regular schedule, and learn new tasks. (*Id.*) Dr. Alexander also noted that Guilbe would "benefit from supervision due to [his] ongoing drug and alcohol abuse." (*Id.*) Dr. Alexander further stated that Guilbe could make appropriate decisions, relate adequately to others, and deal with limited stress. (*Id.*)

Guilbe began abusing alcohol, cannabis, cocaine, and heroin when he was thirteen years old. (*Id.* at 130.) He stated that he uses alcohol and drugs, with the exception of heroin, daily. (*Id.*) He reported using one bag of heroin a week, having last used heroin the week before. (*Id.*) Guilbe had last used drugs the previous day, including alcohol, marijuana, and cocaine. (*Id.* at 131.) He reported having two courses of inpatient drug and alcohol treatment, and was currently receiving 75 milligrams of methadone as part of his outpatient methadone treatment program. (*Id.*)

Dr. Alexander's opinion was that Guilbe presented symptoms consistent with psychiatric and substance abuse problems, noting that his substance abuse problems were significant enough to interfere with his ability to function on a daily basis. (*Id.* at 132.) He diagnosed Guilbe with mild depressive disorder, as well as polysubstance dependence. (*Id.*) He also noted that Guilbe would not be able to manage his own funds because of his alcohol and drug use. (*Id.* at 133.)

### c.  Federal Employment and Guidance Service Evaluations (April – May 2012)

On April 13, 2012, Wesner Petit-Frere, a Federal Employment and Guidance Service (FEGS) social worker, evaluated Guilbe. (R. at 150-61.) Guilbe reported that he was unable to work because of depression and back and knee pain. (*Id.* at 160.) Petit-Frere reported that, although Guilbe was in drug treatment, he was using drugs, including heroin and marijuana, and he had used drugs the previous week. (*Id.* at 156-57.) While Guilbe reported being able to travel

7

alone to his various appointments, he said that he was depressed, had trouble sleeping, and had little appetite. (*Id.* at 158-59.) Petit-Frere recorded Guilbe's depression severity as "moderate."[8] (*Id.*) Petit-Frere also noted Guilbe's homelessness and substance abuse as specific barriers to employment, and that Guilbe was "not interested in working." (*Id.* at 160, 154.)

On April 13, Dr. Rose Chan, a FEGS physiatrist, [9] also evaluated Guilbe. (*Id.* at 164-67.) She diagnosed him with lumbago.[10] (*Id.* at 169.) Dr. Chan recommended that Guilbe avoid high stress, and limit his lifting to fifty pounds maximum, one to ten times per hour. (*Id.* at 166-67.) Finally, she noted that he was "very agile," that he reported no pain during the appointment, and that his physical exam was "benign." (*Id.* at 176-77.) Dr. Chan diagnosed Guilbe with anxiety, unspecified personality disorder, and unspecified episodic mood disorder, and referred him to a psychiatrist for his depression. (*Id.* at 169, 175.)

The evaluation by Dr. Harvey Barash, a FEGS psychiatrist, on April 17, revealed that Guilbe's mental status and cognitive function were essentially unchanged from previous examinations. (*Id.* at 182.) Dr. Barash noted that Guilbe's was depressed, but that he was cooperative, with logical thought patterns and normal affect. (*Id.*) Dr. Barash recorded that Guilbe had moderate ability to follow work rules, and normal ability to accept supervision, deal with the public, relate to co-workers, and adapt to change. (*Id.*) He also noted that Guilbe had

---

[8] This corresponds with Guilbe's score of 13 on the PHQ-9 Patient Health Questionnaire for depression. R. at 158. The PHQ-9 is a self-administered questionnaire used to diagnosis depression severity. *See* Kurt Kroenke, Robert L. Spitzer & Janet B. W. Williams, *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16(9) J. GEN. INTERN. MED. 606 (2001). A PHQ-9 score of 13 corresponds to depression of "moderate" severity. *Id.* at 609.

[9] A physiatrist is "a physician who specializes in physical medicine and rehabilitation." *Physiatrist Definition*, MERRIAM-WEBSTER MEDICAL DICTIONARY, http://www.merriam-webster.com/medlineplus/physiatrist (last accessed Feb. 9, 2015).

[10] Lumbago is an "acute or chronic pain (as that caused by muscle strain) in the lower back." *Lumbago Definition*, MERRIAM-WEBSTER MEDICAL DICTIONARY, http://www.merriam-webster.com/medlineplus/lumbago (last accessed Jan. 30, 2015).

moderate ability to maintain attention and to adapt to stressful situations. (*Id.*) Dr. Barash diagnosed Guilbe with unspecified mood, personality, and anxiety disorders, as well as drug abuse. (*Id.* at 183.) He also included in his evaluation that Guilbe suffered from a reduced ability to "adhere to a regular work routine." (*Id.* at 183.) Dr. Barash noted that Guilbe is "permanently disabled from work," but did not specifically link the disability to any of the four diagnoses. (*Id.*) He recommended outpatient psychotherapy, ambulatory substance abuse treatment, and antidepressants. (*Id.*)

On May 1, Guilbe met with Mr. Jonathan Ortiz.[11] (*Id.* at 187.) Mr. Ortiz's record contains largely the same information as Guilbe's other FEGS evaluations, including limiting his lifting. (*Id.* at 187-89.) Again, the specific barriers to employment were homelessness and substance abuse. (*Id.* at 189.) Mr. Ortiz noted that Guilbe presented "medical and/or mental health conditions that significantly affect functioning." (*Id.*) The report also noted that Guilbe was currently using drugs, including marijuana and heroin, with the last use one week before the appointment. (*Id.* at 190.)

### 3. ALJ Hornblass's Decision

On June 12, 2012, ALJ Hornblass determined that Guilbe was disabled, taking into account limitations from all of Guilbe's impairments, including substance abuse. (R. at 18.) The ALJ, however, found Guilbe not disabled within the meaning of the Act because Guilbe's substance abuse was a contributing factor material to the finding of disability. (*Id.* at 19.) ALJ Hornblass evaluated Guilbe's claim using the five-step sequential analysis, followed by an application of the substance abuse rule.[12] (*Id.* at 13-14.)

---

[11] The Record does not specify Mr. Ortiz's title or expertise.

[12] *See* 20 C.F.R. § 404.1535(a), 416.935(a).

9

First, the ALJ found that Guilbe had "not engaged in substantial gainful activity since September 5, 2010, the alleged onset date." (*Id.* at 14.) Second, he found that Guilbe had "severe impairments," including back pain, knee pain, and active polysubstance abuse. (*Id.* at 15.) He also noted that although Guilbe alleged depression as a disabling condition, the evidence showed that any limitations caused by depression were "mild or slight in severity." (*Id.*) In finding Guilbe's depression to be mild, the ALJ cited medical evidence from MHC, Dr. Alexander, and FEGS.[13] (*Id.* at 16-17.) The ALJ noted that at MHC in March 2011, Guilbe reported feeling "stressed out" and had been working odd jobs since losing his last job. (*Id.* at 16.) The ALJ further cited to Dr. Aimua's report, in which Guilbe's mental status examination was "unremarkable" and in which she reported that Guilbe did not need psychiatric treatment at that time. (*Id.*) The ALJ also cited to Dr. Alexander's report in which he found Guilbe to have a neutral mood, with full-range and appropriate affect. (*Id.*) The ALJ noted that Guilbe's attention, concentration, and memory were intact, and that his cognitive functioning was average. (*Id.*) The ALJ also noted that Dr. Alexander reported that Guilbe was able to care for his personal and household needs, used public transportation alone, and has friends and family members with whom he is close. (*Id.*) The ALJ cited to Dr. Alexander's diagnosis of mild depressive disorder. (*Id.*) Turning to the FEGS records, the ALJ noted Guilbe's score of 13 on the depression inventory and his diagnosis with mood disorder.[14] (*Id.*)

The ALJ also relied on Guilbe's testimony at the hearing in his finding that Guilbe's depression was mild in severity. The ALJ cited Guilbe's statements that he spends the day in

---

[13] In his opinion, ALJ Hornblass does not refer individually to the physicians from either MHC or FEGS, but instead refers collectively to the institution to which they belong.

[14] Here the ALJ refers to the notation by Wesner Petit-Frere, a FEGS social worker, that Guilbe had depression of "moderate" severity. *Id.* at 161.

10

methadone treatment and with his mother, helps his mother with household chores and cooking, and uses public transportation. (*Id.* at 17.)

Third, looking to the listings for musculoskeletal disorders, the ALJ found that Guilbe "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d))." (*Id.* at 15.) Turning to mental impairments, the ALJ found that Guilbe's impairments do not meet the listings for personality disorders or substance abuse disorders. (*Id.*) The ALJ evaluated whether Guilbe suffered marked restriction in any of the following categories: daily living, maintaining social functioning, maintaining concentration, persistence, or pace, or repeated episodes of decompensation.[15] (*Id.*) The ALJ found that Guilbe suffered marked restriction in "activities of daily living," and moderate difficulties in social functioning and concentration, persistence or pace, and that he experienced "no episodes of decompensation." (*Id.*) Thus, because Guilbe had not established marked restriction in at least two of the four categories, he had not established *per se* disability at step three of the sequential analysis. (*Id.*)

At the fourth step of the analysis, the ALJ found that "based on all of the impairments, including the substance use disorders, the claimant has the residual functional capacity to perform light work . . . but he would be unable to maintain a regular schedule or interact appropriately with others on a regular basis." (*Id.* at 16.) The ALJ gave "great weight" to the findings and opinion of Dr. Alexander, the consulting psychologist, because the ALJ deemed his evaluation consistent with the treating source evidence as well as the claimant's own testimony.

---

[15] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. § Pt. 404, Subpt. P, app. 1.

(*Id.* at 17.)  The ALJ found Guilbe's testimony about his symptoms and limitations to be credible, and further found that the severity of Guilbe's substance abuse precluded work, including past relevant work.  (*Id.*)  He also found that in the absence of substance abuse, Guilbe's mental limitations are slight and he is able to perform the full range of light work.  (*Id.*)

In making these findings, the ALJ cited to Dr. Alexander's report stating that Guilbe has not looked for work because of his substance abuse, Guilbe would require supervision of his work because of substance abuse, and his substance abuse interferes with his daily functioning. (*Id.* at 16.)  He noted that the medical evidence indicated that Guilbe had a significant drug history, had relapsed to using heroin every other day, and had tested positive for cocaine, methadone, marijuana, and opiates.  (*Id.* at 16-17.)  The ALJ cited to Guilbe's testimony that he did not currently have clean drug tests, and although he is "working hard" on his recovery, he is not ready to work because of his depression and ongoing drug abuse.  (*Id.* at 17.)

Fifth, taking into account Guilbe's age, education, work experience, and residual functional capacity, based on all his impairments, the ALJ further found that "there are no jobs that exist in significant numbers in the national economy that the claimant can perform."  (*Id.*) Thus, the sum of Guilbe's impairments "so narrow the range of work the claimant can perform that a finding of 'disabled' is appropriate under the framework of this rule."  (*Id.* at 18.)

Finally, the ALJ evaluated Guilbe's condition according to the substance abuse rule, asking whether, in the absence of substance abuse, Guilbe's remaining limitations would cause more than a minimal impact on his ability to perform basic work.  (*Id.* at 13, 18.)  Utilizing the five-step analysis discussed above, the ALJ found that without substance abuse, Guilbe would suffer no more than "mild" limitations in the activities of daily living, social functioning, or concentration, persistence or pace.  (*Id.* at 18.)  The ALJ further found that Guilbe would not

suffer from episodes of decompensation if he stopped the substance abuse. (*Id.*) In making these findings, the ALJ relied on the medical evidence from MHC, FEGS, and the consultative psychologist, as well as Guilbe's own testimony, suggesting that Guilbe is capable of performing daily activities such as household chores, riding public transportation, and attending treatment appointments. (*Id.* at 16-17.)

The ALJ found that, absent the substance abuse, Guilbe "would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed" in the Regulations, and would be able to perform a full range of light work, including relevant past work as a fast food cook or security guard. (*Id.* at 19.) Because his impairment would be mild, and he would have the full ability to work if he stopped using drugs, the ALJ found that Guilbe's substance abuse disorder was "a contributing factor material to the determination of disability." Therefore, the ALJ found that Guilbe was not disabled during the relevant time. (*Id.*)

## C. Appeals Council Review

Guilbe appealed ALJ Hornblass's decision to the Appeals Council on August 13, 2012. (R. at 7.) He submitted additional evidence, which the Appeals Council made part of the record. (*Id.* at 6.) The Appeals Council, however, found much of this evidence to be duplicative of records already submitted, and the remainder pertained to a period after the date of the ALJ's decision. (*Id.* at 2.) The Appeals Council denied Guilbe's request on September 4, 2013. (*Id.* at 1.)

## IV. DISCUSSION

## A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3).

Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether substantial evidence in the Record supports the Commissioner's decision. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is

14

substantial evidence, considering the record as a whole, to support the Commissioner's

decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).

The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48.  Furthermore, even if there

is substantial evidence for the plaintiff's position, a court must uphold the ALJ's decision if there

is substantial evidence to support the defendant's position. *Yancy v. Apfel*, 145 F.3d 106, 111

(2d Cir. 1998).  The substantial evidence standard means once an ALJ finds facts, a reviewing

court may reject those facts "only if a reasonable factfinder would have to conclude otherwise."

*Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994))

(emphasis omitted).

     To be supported by substantial evidence, the ALJ's decision must be based on

consideration of "all evidence available in [the claimant]'s case record."  42 U.S.C.

§§ 423(d)(5)(B), 1382c(a)(3)(H)(i).  The Act requires the ALJ to set forth "a discussion of the

evidence" and the "reasons upon which it is based."  42 U.S.C. §§ 405(b)(1).  While the ALJ's

decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d

1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of

medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v.*

*Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence

of a person's alleged disability. *See Eriksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d

Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008)

(overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002

15

WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409

(reconsideration of improperly excluded evidence typically requires remand). Avoiding rote

analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any

determination . . . with sufficient specificity to enable the reviewing court to decide whether the

determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250,

269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

When parties submit "new and material evidence," the Appeals Council may consider the

additional evidence "only where it relates to the period on or before the date of the administrative

law judge hearing decision." 20 C.F.R. § 404.970(b). "New evidence" refers to "any evidence

that has not been considered previously during the administrative process." *Shrack v. Astrue*,

608 F. Supp. 2d 297, 302 (D. Conn. 2009).

**B. Legal Standards for Determining Disability**

Under the Act, every individual considered to have a "disability" is entitled to disability

insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Id*. at §§ 416(i)(1)(A),

423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's

impairments must be "of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

16

To determine whether an individual is entitled to receive disability benefits, the
Commissioner is required to conduct the following five-step inquiry: (1) determine whether the
claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the
claimant has a "severe impairment" that significantly limits his or her ability to do basic work
activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the
Regulations—if it is, the Commissioner will presume the claimant to be disabled; (4) if not,
determine whether the claimant possesses the residual functional capacity ("RFC") to perform
his past work despite the disability; and (5) if not, determine whether the claimant is capable of
performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999);
*Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden
of proving disability at the first four steps, the burden shifts to the Commissioner at step five to
prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v.
Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the
evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a
disability exists if the claimant proves that his or her severe impairment meets or medically
equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d).
If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the
evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).
A claimant's RFC is "the most he can still do despite his limitations." 20 C.F.R. §§404.1545(a),
416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying
that a claimant's RFC is his maximum ability to perform full-time work on a regular and
continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant

medical and other evidence," including objective medical evidence; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [his alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 1. The Substance Abuse Rule

Notwithstanding a finding of disability, a claimant will be found ineligible for SSI or DIB if alcohol or drug abuse is a contributing factor material to the determination of disability. 42 U.S.C. §§ 423(d)(2)(C), 1382c(3)(J); 20 C.F.R. §§ 404.1535(a), 416.935(a). The significant factor is whether the Commissioner would still determine that the claimant is disabled in the absence of drug or alcohol abuse. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). Thus, the Commissioner must determine which, if any, of the claimant's current physical and/or mental limitations, upon which the Commissioner based the current disability determination, would remain were the claimant to stop using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). Then, depending on whether the claimant's remaining limitations would be disabling, the Commissioner must decide whether the claimant is disabled. 20 C.F.R §§ 404.1535(b)(2)(i), 416.935(b)(2)(i); 404.1535(b)(2)(ii), 416.935(b)(2)(ii). When the Record reflects drug or alcohol abuse, the claimant must prove that substance abuse is not a contributing factor material to disability determination. *See Cage v. Comm'r of Social Security*, 692 F.3d 118, 123-4 (2d Cir. 2012).

Evidence, such as medical records, showing improvement during periods of sobriety can be used to support the conclusion that a claimant's condition would improve such that they would no longer be found disabled. *See Tablas v. Apfel*, No. 98 Civ. 5430 (RMB), 2000 WL 423914, at *1 (S.D.N.Y. Mar. 21, 2000) (finding plaintiff's drug and alcohol dependence were contributing factors material to disability where medical evidence showed that plaintiff relapsed several times into alcohol and drug dependence and that his impairments improved during periods of sobriety to the point that he could work). The ALJ, however, is also permitted to review the Record as a whole in order to make a finding of whether substance abuse is a

19

contributing factor material to disability. *See Cage*, 692 F.3d at 126-27 (holding that an ALJ

may find drug use a contributing factor material to disability even without medical opinion

specifically addressing the claimant's limitations absent substance abuse).

## C. The ALJ Properly Reviewed and Considered the Evidence, and Applied the Correct Legal Principles

### 1. The ALJ Properly Applied the Governing Standard

The first task of the Court is to determine whether the Commissioner applied the correct

legal principles in determining Guilbe's eligibility for disability benefits. *Rosa v. Callahan*, 168

F.3d 72, 77 (2d Cir. 1999). The ALJ's task in this instance is to determine what impairments, if

any, would remain if Guilbe stopped his substance abuse, and whether those remaining

impairments would be disabling for the purposes of the Act. 20 C.F.R. §§ 404.1535, 416.935.

After first finding Guilbe to be disabled under the Act, ALJ Hornblass properly applied these

principles. (R. at 18-19.)

First, the ALJ discussed whether Guilbe's limitations, other than substance abuse, would

cause more than a minimal impact on his ability to perform basic work activities. (*Id.* at 19.) He

found that Guilbe's knee and back pain would continue to restrict him to light work activities.

(*Id.*) In so finding, the ALJ relied on evidence from Dr. Chan at FEGS, in which she noted

Guilbe's complaints of knee and back pain, found him to be "very agile," and reported that his

knee and back exam "were within normal limits." (*Id.* at 16.) The ALJ noted that Guilbe

reported no recent medical treatment for knee or back pain. (*Id.*)

Next, the ALJ determined that Guilbe's impairments do not meet or medically equal any

of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.00

(musculoskeletal disorders). (*Id.*) Then the ALJ looked to 20 C.F.R., Part 404, Subpart P,

Appendix 1, Section 12.00 to evaluate whether Guilbe's impairments would meet a mental

20

disorder listed therein, were Guilbe to stop his substance abuse. Evaluating the extent to which

any mental limitations would remain in the absence of substance abuse, the ALJ found that

restrictions on Guilbe's daily functioning would improve from "marked" to "mild," and that

restrictions on his social functioning and concentration, persistence, or pace would improve from

"moderate" to "mild." (*Id.* at 19.) The ALJ also found that Guilbe would experience no

episodes of decompensation without substance abuse. (*Id.*) Thus, the ALJ found that Guilbe's

mental limitations would not be severe if Guilbe stopped his drug use. (*Id.*) The basis for this

finding was the medical evidence from MHC, the consultative psychologist, and FEGS, as well

as Guilbe's own testimony.

The ALJ noted that at MHC in March 2011, Guilbe reported insomnia, and was "feeling

stressed out recently" since losing his apartment. (*Id.* at 16.) Guilbe denied any problems with

concentration, his mental status examination was "unremarkable," and he did not need

psychiatric treatment at that time. (*Id.*) The ALJ noted that in October 2011, Dr. Alexander, a

consultative psychologist, found it "apparent" that the reason that Guilbe had not looked for

work in over a year was his substance abuse, but that his mental status examination was

unremarkable. (*Id.*) Dr. Alexander also reported that Guilbe could care for all his personal and

household needs, used public transportation independently, and maintained close relationships

with his friends and family. (*Id.*) The ALJ further cited to Dr. Alexander's mild depressive

disorder diagnosis, and the fact that it was Guilbe's substance abuse that led Dr. Alexander to

suggest that Guilbe would benefit from supervision. (*Id.*) The ALJ cited to the FEGS report that

listed Guilbe's complaints as back and knee pain, and depression. (*Id.*) He noted that Guilbe

21

"got a score of 13 on the depression inventory and was diagnosed with a mood disorder"[16] and

that he had "no interest in working." (*Id.* at 16-17.) The ALJ cited Guilbe's statement at the

hearing that he was unable to work because of depression and substance abuse, but also noted

that Guilbe testified that he spends his days at methadone treatment and with his mother, and he

helps her with household chores and cooking. (*Id.* at 17.) The ALJ noted Guilbe's testimony

that he has family in Puerto Rico with whom he speaks by telephone, and he uses public

transportation independently. (*Id.*).

Third, the ALJ found that without substance abuse, Guilbe's "medically determinable

impairments could reasonably be expected to produce the symptoms [he] alleged." (*Id.*)

However, giving great weight to Dr. Alexander's findings and opinions, as well as significant

weight to the treating source records and Guilbe's own testimony, the ALJ further found

Guilbe's statements as to the "the intensity, persistence, and limiting effects" of his symptoms

"do not support a finding that the claimant's condition is of disabling severity." (*Id.*)

Finally, in accordance with his re-application of the five-step analysis while assuming the

absence of substance abuse, the ALJ found that Guilbe would be able to perform his past work,

either as a security guard or a fast food cook, were he to cease his substance abuse. (*Id.*) His

past work "did not require the performance of work-related activities precluded by the residual

functional capacity [Guilbe] would have" without substance abuse. (*Id.*) Thus, the ALJ

concluded that Guilbe's substance abuse was a contributing factor material to the determination

of disability.

---

[16] The ALJ here refers to Guilbe's score of "moderate" depression at FEGS, and his diagnosis of unspecified
episodic mood disorder, unspecified personality disorder, other, mixed, or unspecified drug abuse, and anxiety,
unspecified. R. at 161, 183.

### 2. Substantial Evidence Exists to Support the ALJ's Determination

In finding that Guilbe would not be disabled in the absence of drug abuse, the ALJ

concluded that Guilbe's depression was mild, and determined that his back and knee pain would

not preclude him from performing light work.[17]  (R. at 15, 19.)  Although the ALJ determined

that Guilbe was credible regarding his alleged symptoms, he also found that Guilbe's testimony

regarding the "intensity, persistence and limiting effects of these symptoms" did not support a

finding that he would be disabled absent substance abuse.  (*Id.* at 19.)  The ALJ relied on

consulting psychiatrist Dr. Alexander's findings and opinions, as well as the treating source

records and Guilbe's own statements and testimony.  (*Id.*)

The medical evidence supported the ALJ's determination.  Dr. Alexander found that

Guilbe was overall a normally functioning individual, despite polysubstance dependence.  (*Id.* at

130-33.)  Specifically, he found that Guilbe was cooperative, friendly, alert, and polite and

furthermore, he was able to perform simple and complex tasks, understand simple directions, and

learn new tasks.  (*Id.* at 131-32).  Dr. Alexander also noted that Guilbe said he believed himself

capable of cooking, cleaning, shopping, and managing his own money "if circumstances

permitted."  (*Id.* at 132.)

Dr. Alexander specifically attributed the two particular impairments he identified in

Guilbe (inability to manage money and need of supervision) to substance abuse.  (*Id.* at 132-33.)

Dr. Alexander also opined that the reason Guilbe had not looked for work since summer 2010

was because of his drug and alcohol abuse.  (*Id.* at 130.)  Importantly, Dr. Alexander diagnosed

---

[17] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

Guilbe with both mild depression as well as polysubstance abuse, but found that only the substance abuse was "significant enough to interfere with [Guilbe's] ability to function on a daily basis." (*Id.* at 132.) Dr. Alexander's assessment also supports the ALJ's finding that Guilbe's "daily activities" and "social function" would improve without his substance abuse. (*Id.* at 19.)

The MHC medical records similarly characterize Guilbe's depression as minor or mild, and Guilbe reported no symptoms beyond insomnia and depressed mood. (*See generally id.* at 106-07, 109-10, 112, 115.) Guilbe stated to Dr. Aimua that he was "sad" and "stressed out" after losing his apartment, and reported difficulty sleeping, but did not report hopelessness, suicidal or homicidal ideation, psychotic symptoms, anger, anxiety, or difficulty concentrating. (*Id.* at 109.) Dr. Goodman reported substantially the same results as Dr. Aimua. (*Id.* at 112-15.)

At FEGS, Dr. Barash[18] found that Guilbe was functioning normally in a wide array of areas, including a normal mental status examination (aside from depressed mood) and normal cognitive functioning. (*Id.* at 182.) Although Dr. Barash recorded that Guilbe was "permanently disabled from work," he does not connect that disability to any specified mental impairment. (*Id.* at 183.) He recorded that Guilbe had a normal ability to accept supervision, deal with the public, relate to co-workers, and adapt to change. (*Id.*) He also reported that Guilbe had only moderate impairment of ability to follow work rules, maintain attention, and adapt to stressful situations. (*Id.*)

Guilbe's treatment at MHC emphasized his substance abuse, and notes knee and back pain only once. (*Id.* at 106-09, 118.) Additionally, Guilbe mentioned his back pain as an issue only once during his hearing. (*Id.* at 47.) There is no indication in the Record that he sought

---

[18] ALJ Hornblass does not refer to Dr. Barash by name in his opinion, and does not refer to Dr. Barash's assessment that Guilbe is "permanently disabled from work." *Id.* at 183. ALJ Hornblass, however, does refer to the FEGS records collectively.

treatment for back or knee pain, and no evidence that he was ever on medication for it. Although Guilbe was diagnosed by Dr. Chan at FEGS with lumbago on April 13, 2012, she noted that he did not present either knee or back pain at the appointment, and he was "very agile." (*Id.* at 166, 169.) She did not prescribe pain medication, and recorded on April 17, 2012, that Guilbe had no history of using pain medication for his knee or back. (*Id.* at 177.) Nowhere does Dr. Chan report that Guilbe's knee and/or back pain prevents him from working. Thus, the Record supports the ALJ's finding that Guilbe's knee and back pain were not of disabling severity.

The Record does not contain evidence regarding Guilbe's work history or mental health history during any period of sobriety. Indeed, Guilbe testified that he has been addicted to heroin for twenty-five years and relapsed seven times during his last two years of methadone treatment. (*Id.* at 57.) According to Dr. Alexander, Guilbe began using drugs at the age of thirteen. (*Id.* at 131.) Even without such evidence regarding his ability to function sober, Guilbe's testimony is consistent with the ALJ's determination that without substance abuse he would be capable of performing a full range of light work. (*Id.* at 49-51.) In response to questions from the ALJ, Guilbe testified that he has been in treatment for two years, and goes to pick up his methadone at 8:00 a.m. each day, independently taking the train to and from the treatment center. (*Id.*) After treatment, Guilbe takes the train to his mother's house, where he checks on her, cooks, goes shopping at the supermarket, accompanies her to appointments, takes care of her dogs, and cleans the house. (*Id.* at 50-51.) Guilbe did not identify depression or knee and back pain as the reason he had lost either of his previous jobs; instead, one job was temporary employment and he testified that he was laid off as a security guard. (*Id.* at 46-47.)

The claimant bears the burden of proof to show that substance abuse is not a contributing factor material to disability. *Cage v. Comm'r of Social Security*, 692 F.3d 118, 123-25 (2d Cir.

2012). Guilbe, however, has not presented evidence that suggests his depression or knee and back pain, absent his substance abuse, are severe enough to qualify him as disabled within the meaning of the Act. Reviewing the Record as a whole, there is substantial support for the ALJ's conclusion that without substance abuse, Guilbe would no longer be disabled and his condition would improve. Therefore, the ALJ applied the correct legal standard and substantial evidence supports his conclusion.

## IV. CONCLUSION

For the reasons set forth above, I recommend that the Court **GRANT** the Commissioner's Motion for a Judgment on the Pleadings and **DISMISS** the Complaint.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable J. Paul Oetken, 40 Foley Square, Room 2101, New York, NY 10007 and to the chambers of the undersigned, 500 Pearl Street, Room 1970, New York, NY 10007. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed.R.Civ.P. 72, 6(a), 6(d).

**DATED: March 12, 2015**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

26